DANIEL N. GUTMANN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 85242. Promulgated September 30, 1933.

*H. N. Wyatt, Esq.,* and *W. R. Arrington, Esq.,* for the petitioner.
*Carroll Walker, Esq.,* for the respondent.

680

682

OPINION.

KERN: 1. The first question is whether petitioner is barred from taking a deduction for the loss of $12,615.69 claimed by him on the surrender of his Gutmann & Co. stock on the ground that it is within the prohibition of the "wash sale" provision, section 118 of the Revenue Act of 1932, set out in the margin.[1] The respondent contends in his deficiency notice that the option given to petitioner "was a part of a transaction whereby 519 shares of Gutmann & Co. stock were surrendered in consideration of the cancellation of notes given

---

[1] SEC. 118. LOSS FROM WASH SALES OF STOCK OR SECURITIES.

(a) In the case of any loss claimed to have been sustained from any sale or other disposition of shares of stock or securities where it appears that, within a period beginning 30 days before the date of such sale or disposition and ending 30 days after such date, the taxpayer has acquired (by purchase or by an exchange upon which the entire amount of gain or loss was recognized by law), or has entered into a contract or option so to acquire, substantially identical stock or securities, then no deduction for the loss shall be allowed under section 23 (e) (2); nor shall such deduction be allowed under section 23 (f) unless the claim is made by a corporation, a dealer in stocks or securities, and with respect to a transaction made in the ordinary course of its business.

(b) If the amount of stock or securities acquired (or covered by the contract or option to acquire) is less than the amount of stock or securities sold or otherwise disposed of, then the particular shares of stock or securities the loss from the sale or other disposition of which is not deductible shall be determined under rules and regulations prescribed by the Commissioner with the approval of the Secretary.

(c) If the amount of stock or securities acquired (or covered by the contract or option to acquire) is not less than the amount of stock or securities sold or otherwise disposed of, then the particular shares of stock or securities the acquisition of which (or the contract or option to acquire which) resulted in the nondeductibility of the loss shall be determined under rules and regulations prescribed by the Commissioner with the approval of the Secretary.

by you to the company in payment for certain stock." The option appears as part of the minutes of the meeting of the board of directors on June 27, 1933. The uncontradicted testimony of the petitioner, however, shows that he was in complete ignorance of the option as an existing or potential right until late in September 1933, some three months after his surrender of the stock to the company on June 27 of that year; and the testimony of the company's treasurer shows that it was the custom of the company to have its minutes drawn by its counsel; that the idea of an option to be given the surrendering stockholders, as he put it, "to sweeten the pill", occurred to him the day after the meeting, and he suggested it to counsel, who did not draw the minutes in question until September; and the option was thereafter read and approved by the directors as part of the minutes.

The petitioner contends that no contract right between petitioner and the corporation could arise until the board of directors had acted in September; that petitioner had done nothing in the interim to become a party to such a contract; that, there being no written evidence of the option contract made within 30 days either before or after June 27, 1933, it was, even if existent within this period, invalid under the Illinois Statute of Frauds, Smith-Hurd's Illinois Annotated Statutes, ch. 121½, sec. 4; and that the option was unenforceable for lack of consideration.

We are not concerned here with the question of varying a written instrument by parol evidence, since there is no attack on the ultimate validity of the option after it was ratified by the corporation's board of directors and made known to petitioner. Its validity within 30 days after the surrender by petitioner of his stock in consideration of the cancellation of his indebtedness to the corporation is alone to be considered. An analogous question was recently decided by the Court of Appeals for the First Circuit in *Carney* v. *Crocker*, 94 Fed. (2d) 914, where the trustees and directors of a trust association who owned over 50 percent of its stock on March 24, 1933, adopted a resolution to distribute a dividend on June 29, 1933, to shareholders of record on June 22, 1933, subject to the approval of the president, treasurer, and assistant treasurers. The resolution was informally approved by such officers on or about April 25, 1933, but the approval was not recorded on the books or made public or in any manner communicated to any of the shareholders except the trustees. The dividend was distributed on the date specified. The court said:

* * * Here the resolution voted by the trustees, the directors, on March 24, 1933, by its very terms was not a fully declared dividend, for it was made conditional upon the approval of the president, treasurer and assistant treasurers. It is true that on April 25, 1933, and prior to June 16, of that year, the officers of the association described in the resolution met and informally ap-

proved the resolution, but their informal approval was not recorded on the books of the corporation (if that would have been helpful) or made public, or communicated to any of the shareholders except the trustees, who in this case stand as the directors of the association. In other words the shareholders other than the director-trustees, had no knowledge of an approval of the resolution. This being so the relation of debtor and creditor, between the association and the shareholders, did not arise before June 16, 1933, and it was within the power of the trustees, so far as this record discloses, to have rescinded the resolution of March 24, 1933, at any time before June 29, 1933, when the distribution was made. It necessarily follows that the dividend was not fully and unconditionally declared before June 16, 1933, and was subject to the tax imposed by section 213 (a) [of the National Industrial Recovery Act].

The same conclusion must be reached here, that no contract in respect of the option existed between petitioner and the corporation before the option was ratified by the corporation's directors; or, if the option right be treated as a gift, and informal ratification could be assumed, that the gift was not completed until acceptance by the petitioner donee, a necessary requisite.

The statute provides that no deduction shall be allowed where "the taxpayer  *  *  *  has entered into a contract or option so to acquire, substantially identical stock or securities." The testimony here is uncontroverted that petitioner had no knowledge of the proposed option until some time in September, more than two months after his surrender of his stock. There is a rational explanation of what was done, and the testimony, unlike that in *Rand* v. *Helvering*, 77 Fed. (2d) 450, is not colored by the circumstances. It would seem obvious therefore that he could not in any sense be said to have "entered into a contract or option" within the proscribed period.

The loss on surrender by petitioner of his shares was obviously a capital loss and deductible as such.

2. We turn now to the second question, the March 1, 1913, value of the 189 shares sold by petitioner on June 27, 1933, which he had received as part of a gift of 200 shares from his father in 1925. In the case of gifts, the donee, of course, must take the donor's basis, sec. 113 (a) (2); and, since the donor held these shares, or rather earlier shares of which these were the natural proliferation in the course of corporate growth, on March 1, 1913, the respondent must employ the fair market value on that date as his basis, sec. 113 (a) (13). In doing so he has used existing book values as of that date of $85.77 a share, which has resulted in his determination of a gain of $7,108 on their surrender in 1933. The petitioner in his return used the same 1913 book value, but in his petition contends that this was erroneous. He now denies that any gain was realized on the whole transaction of surrender, and contends that the evidence supports a March 1, 1933, value of $133 a share, upon which he founds his claim for a refund of taxes paid in the amount of $129.17. He also contends that the stipulation supports a finding that only

189 of the 200 shares received as a gift were surrendered, but it is impossible to tell from the record which shares were surrendered, since the certificates covering all 530 shares were turned over by petitioner to the corporation and one new certificate for 11 shares was received back by him. We must resort to the presumption raised by the Commissioner's "first in, first out" rule, Art. 58, Regulations 77; and, since the gift shares were the last received by the petitioner, we may presume that those sold and surrendered included only 189 of these, and thus hold in his favor. The benefit of the rule, although commonly invoked by the Commissioner, need not on that account be denied to petitioner.

We think the 1913 basis used was too low, and have found that the shares sold were then worth not less than $133 each, or more than the sale price to Gutmann & Co., which was $121.31, and accordingly that no gain was realized on the sale.

We need not elaborate the facts set out in our findings which support this conclusion. Since Gutmann & Co. was a closely held corporation and no sales of its stock took place around March 1, 1913, its stock value must be determined by the then value of its assets, sec. 113 (a) (13). Its methods of accounting were very conservative, as two expert witnesses testified and as is shown by an auditor's report drawn February 20, 1923, and put in evidence. Proper adjustments in capital account and depreciation showed that net earnings had been underestimated and the assets thereby undervalued, and, since no proper account had been taken of the value of intangibles, good will, and the trade secrets of tanning employed by the company, the value of these intangibles must be added to the total value of the assets.

Without approving in detail the methods employed by the expert witnesses in arriving at a valuation, we are of the opinion that in all the circumstances the determination of a fair market value on March 1, 1913, of $133 a share for the 189 shares was reasonable and supported by the evidence. We hold, accordingly, that the deficiency be expunged and that the petitioner has made an overpayment.

*Decision will be entered under Rule 50.*